**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES**,<br><br>v.<br><br>**LARRY WHITE (1), MARK ANTHONY FLETCHER III (2),** and **MALIK KEYON BYNUM (3),**<br><br>Defendants. | No. 25-cr-150 (TSC) |

**MEMORANDUM OPINION**

The Government alleges that on July 2, 2021, Defendants Larry White, Mark Fletcher, and Malik Bynum—each armed with a gun—conspired to rob and did rob Rosendo Miller outside a convenience store in the Brentwood neighborhood of Washington, D.C.  During the robbery, White allegedly shot Miller several times, killing him.  Each Defendant now stands indicted with Conspiracy to Commit Armed Robbery in violation of 22 D.C. Code § 1805a; First Degree Murder While Armed under a felony murder theory in violation of 22 D.C. Code §§ 2101, 4502; Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Felony in violation of 18 U.S.C. § 922(g)(1); and three other related counts.  *See* Indictment, ECF No. 1.[1]  With trial set to begin on May 18, 2026, the parties have filed a flurry of motions. This Opinion resolves most of them, with the remainder to be discussed at the Pretrial Conference on April 28.

---

[1]  The other counts include one count of Robbery While Armed in violation of 22 D.C. Code §§ 2801, 4502; and two counts of Possession a Firearm During a Crime of Violence or Dangerous Offense in violation of 22 D.C. Code §§ 4504(b).

# I.     BACKGROUND

## A.  Factual Background

The Government alleges that on July 2, 2021, around 8:36 p.m., Defendants saw Rosendo Miller and his friend enter a convenience store located at 1356 Brentwood Road NE.  Upon seeing Miller's Rolex watch and designer clothing, Defendants ran to a Volkswagen Passat parked nearby and obtained firearms.  Each Defendant then pulled ski masks over their heads, returned to the front of the store, and waited for Miller to exit.  When he did, Defendants jumped him and tackled him to the ground, and Miller's friend ran off.  Fletcher and White pinned Miller down while Bynum took his Gucci bag.  While Defendants were robbing Miller, an unidentified shooter fired a single shot from a nearby intersection.  Bynum then ran towards the intersection, firing his gun.  Meanwhile, Fletcher and White continued to hold Miller down as White shot Miller several times.  Miller died from his gunshot wounds.

On April 17, 2026, the court held a hearing on two pending Motions: (1) Defendants' Motion to Exclude Opinion Testimony by Lay Witnesses, ECF No. 37; and (2) Defendants' Motion to Suppress Tangible Evidence and Statements, ECF No. 43.  *See* Min. Entry (Apr. 17, 2026).  At the hearing, the Government called two witnesses:  Investigator Joshua Anderson and Detective Roberto Amengual.  Hr'g Tr. at 8, 94, ECF No. 84.[2]  Investigator Anderson has been with the Metropolitan Police Department ("MPD") since 2013.  Between 2013 and 2017, he was a patrol officer in Police Service Area 505, which encompasses the 1300 block of Brentwood Road NE.  *Id.* at 33.  Starting in 2017 and at the time of the alleged robbery, Anderson was an officer with the Fifth District's Crime Suppression Team, which likewise covers the Brentwood

---

[2]  Based on their demeanor and the evidence corroborating their testimony, the court finds these witnesses credible for the purpose of this hearing.

area. *Id.* Detective Amengual has been with MPD since 2015. Between 2018 and 2023, he worked with the Fifth District's Crime Suppression Team. *Id.* at 95.

Through their work in the Fifth District, both Anderson and Amengual were familiar with Fletcher and Bynum prior to the alleged robbery in 2021. Anderson operated an undercover Instagram account to familiarize himself with individuals in the neighborhood, especially individuals with prior arrests and individuals tagged in group photos with others who were suspected of being involved in criminal activity. Hr'g Tr. at 14–15, 17–18, 83–84. Anderson began following Fletcher on Instagram in 2017 and saw posts of Fletcher posing with firearms. *Id.* at 17–21. Fletcher's face is clearly visible in those posts. *See id.* In late 2017 or early 2018, Anderson initiated a firearms investigation into Fletcher and obtained a warrant for Fletcher's Instagram data. *Id.* at 18–19. That investigation ultimately did not result in any arrest or charges. Anderson nevertheless continued to see Fletcher around the neighborhood approximately every other week when Fletcher was not incarcerated and participated in an arrest of Fletcher in 2019. *Id.* at 23–24. Through Instagram, Anderson also followed and became familiar with Bynum, and it "was not uncommon" for Anderson to see Fletcher and Bynum together. *Id.* at 29–30. Anderson also periodically saw Bynum in the neighborhood and participated in at least one arrest of Bynum. *Id.* at 28.

Detective Amengual became familiar with Fletcher in 2018, and with Bynum in 2019. Amengual saw both men while on patrol about once a week, except for periods where Fletcher was incarcerated, and saw them together a handful of times prior to the alleged robbery. Hr'g Tr. at 97–98. In 2019, Amengual participated in one arrest of Fletcher and one arrest of Bynum. *Id.* at 98. Amengual also participated in a 2021 traffic stop involving Bynum. *Id.*

On the afternoon of the robbery, Anderson was assigned to an observation post on the 1300 block of Brentwood Road.  Hr'g Tr. at 26.  While there, he saw Fletcher and noted that Fletcher was wearing an ankle monitor and a black shirt with a green square.  *Id.* at 27.  At the time, Fletcher was on supervised release in connection with a D.C. Superior Court case, and his Court Supervision Officer had placed a GPS monitor on his ankle as a sanction for his noncompliance with his release conditions.

At around 8:30 p.m., Anderson went to the Fifth District police station for a meeting.  Hr'g Tr. at 35.  During the meeting, a live video feed of CCTV footage capturing the 1300 block of Brentwood Road was playing in the background.  *Id.* at 100, 106–07.[3]  Something on the footage caught Detective Amengual's attention, and he realized there had been a shooting.  *Id.* at 38–39, 106.  He promptly notified the Fifth District over radio.  *Id.*  Anderson then responded to the scene to canvas the area.  *Id.* at 39.  He later returned to the station, where he reviewed the CCTV footage of the robbery.  *Id.*  Anderson and Amengual each recognized Fletcher and Bynum as two of the individuals who allegedly robbed Miller.  *See id.* at 39, 43, 100.  Officers also observed two suspects flee in a gray Ford Fusion.  *Id.* at 101.

At some point that night, MPD obtained Fletcher's GPS data from the Court Supervision and Offender Services Agency, which placed him at a house on the 5000 block of Gay Street NE.  Hr'g Tr. at 44, 48.  Anderson asked the head of the investigation, Detective Decker, whether he could go to Gay Street to locate Fletcher.  *Id.*  Decker instructed him "to go there and wait until a search warrant could be obtained."  *Id.* at 48.  About two hours after the robbery, at

---

[3]  The CCTV footage was captured by private security cameras that the property manager had allowed MPD to access.  Hr'g Tr. at 38, 100.

around 10:53 p.m., Anderson, Amengual, and several other officers arrived on Gay Street, where they recognized a gray Ford Fusion parked on the street. *Id.* at 48–49, 101.

Body-worn camera footage of the encounter shows that Anderson and Amengual quickly recognized Fletcher and Bynum as occupants of the Fusion. *See* Gov't Hr'g Ex. G at 22:53:49–22:55:24. Specifically, as the officers drove past the Fusion, multiple officers can be heard saying, "they're in the car." *Id.* Then, as the officers approached the Fusion with their guns drawn, Anderson shined his flashlight on Fletcher and yelled, "Fletcher, unlock the door;" Amengual told another officer to "get Bynum out, get Bynum out, get Bynum out." *Id.* The officers then detained Defendants on Gay Street until they received permission from Detective Decker to arrest them, at which point Defendants were brought to the police station. *Id.* at 51. The Government asserts, and Defendants do not dispute, that officers subsequently searched the gray Ford Fusion pursuant to a warrant and recovered Miller's stolen Rolex. *See* Gov't Opp'n to Defs.' Mot. to Suppress at 3, ECF No. 70.

### B. Procedural History

The Government initially charged Defendants in D.C. Superior Court on July 3, 2021, and they have been held without bond since that time. *See* Order Granting Govt's Mot. to Dismiss Indictment at 1, *United States v. Fletcher*, 2021 CF1 003714 (D.C. Super. Ct. Aug. 8, 2025) (Ryan, J.) (hereinafter "Dismissal Order"). Defendants were subsequently arraigned in November 2021. *Id.* There were "initial scheduling delays due in part to the COVID-19 pandemic," Defs.' Mot. to Dismiss at 2, ECF No. 36, but in January 2023, a trial date was set for January 27, 2025 in Superior Court. *See id.* It appears none of the Defendants objected to that initial trial date. *See* Dismissal Order at 14. The Government represents that this late trial date was "due to the significant backlog . . . of the Felony 1 calendars in D.C. Superior Court," and

the availability of three defense lawyers, the Government, and the court.  Gov't Opp'n to Defs.'

Mot. to Dismiss at 2, ECF No. 73.  Defendants similarly represent that the late initial trial date

was attributable to "the need to coordinate schedules for defense and government counsel and the

court."  Defs.' Mot. to Dismiss at 2.

In June 2024, Bynum moved to continue the January 2025 trial date.  His counsel—a

lawyer with the Public Defender Service ("PDS")—explained that she was assigned the case

when Bynum's previous public defender left PDS, that she had another trial scheduled for the

same time in a different case that was older than Bynum's, that her "client in that matter would

be prejudiced by any additional continuances," and that no other PDS attorney was available for

trial in January 2025.  *See* Bynum's Mot. to Continue Trial at 1–2, *United States v. Bynum*, 2021

CF1 003715 (D.C. Super. Ct. June 15, 2024).  White and Fletcher stated in writing "that they did

not object to the continuance."  Dismissal Order at 2.

The Government, however, "vehemently" opposed.  Gov't Opp'n to Bynum's Mot. to

Continue at 3, *United States v. Bynum*, 2021 CF1 003715 (D.C. Super. Ct. June 27, 2024).  It

asserted that it was "prepared to go forward as scheduled" and that a continuance would

"severely prejudice the government, the witnesses, and the decedent's family."  *Id.*  The

Government requested that the Court transfer Bynum's case to a CJA attorney if no PDS

attorney was available.  *See id.*  Judge Raffinan rejected the Government's request, granted

Bynum's motion, and rescheduled the trial for December 1, 2025.  *See* Dismissal Order at 2.

White's counsel subsequently informed the Government that White would seek a

continuance of the December 2025 trial date.  *See* Dismissal Order at 12 ("[C]ounsel for Mr.

White confirmed at the June 26, 2025 Status Hearing that Mr. White would seek a continuance

of the December 1, 2025 trial date.").  The Government then sought to move the case to federal

court.[4]  After a federal grand jury indicted Defendants in May 2025,[5] the Government moved to dismiss the Superior Court case.  When all three Defendants opposed, the Government explained that its decision to move the case to federal court was motivated by its frustration with the delays and lack of progress it had encountered in Superior Court.  *See* Gov't Reply in Supp. of Mot. to Dismiss at 3, *United States v. Bynum*, 2021 CF1 003715 (D.C. Super. Ct. June 17, 2025).  The Government pointed to Bynum's previous motion for a continuance, White's forthcoming motion for a continuance, the "Superior Court's significant backlog of Felony 1 cases, vacancies on the bench causing overcrowded Felony 1 calendars, and defense counsel availability."  *Id.* at 4.  The Government complained the case "is now four years old," but "nothing of substance has been litigated or decided."  *Id.*  It argued that the case would be resolved more quickly in federal court.  *Id.* at 9.  Only after the Government secured an indictment in federal court and moved to dismiss the case did Fletcher move to sever his trial from those of his codefendants "if either or both are unavailable" for the December 2025 trial date.  *See* Fletcher's Mot. to Sever at 1, *United States v. Fletcher*, 2021 CF1 003714 (D.C. Super. Ct. June 24, 2025).  Neither White nor Bynum ever moved to sever in Superior Court.

Judge Ryan granted the Government's motion to dismiss without prejudice and denied Fletcher's motion to sever as moot.  *See* Dismissal Order at 1.  He found no evidence "to suggest an improper government motive in seeking to dismiss the indictment."  *Id.* at 10.  Judge Ryan took "seriously" the Government's representation "that trial in federal court would occur more

---

[4]  The Government represents that it did not seek indictments in federal court until after White's counsel informed it that she would seek a continuance.  *See* Gov't Opp'n to Defs.' Mot. to Dismiss at 3, ECF No. 73.  The court has seen no indication to the contrary.

[5]  The federal indictment contains the same charges as the Superior Court indictment, except the Government changed the charge for unlawful possession of a firearm by a person convicted of a felony from a violation of the D.C. Code to a violation of 18 U.S.C. § 922(g)(1).

quickly than trial before this Court, especially in light of [] White's imminent motion to continue." *Id.* at 15. And he concluded that the Government's "proffered reason for seeking dismissal" in Superior Court—in order "to expedite trial of these matters in federal court"—was not a bad faith reason. *Id.* at 12.

Judge Ryan further rejected Fletcher's argument that moving the case to federal court would violate his speedy trial right or impair his defense. *See* Dismissal Order at 12–18. Judge Ryan found that the length of time the case had been pending, although significant, was "not principally of the government's making." *Id.* at 13. Rather, he noted, "a significant portion of the delay is attributable to the defendants." *Id.* Judge Ryan also emphasized that the record did not "reflect prior assertions" by Fletcher "of his right" to a speedy trial. *Id.* To the contrary, Fletcher did not object to the initial trial date set three-and-a-half years from the date of his arrest, and he did not object to Bynum's request for a continuance. *Id.* Judge Ryan concluded that "too much time has passed between [] Fletcher's arrest and his assertion" of his speedy trial right in his opposition to the Government's Motion to Dismiss "to credit his assertion significantly." *Id.* at 14. He concluded that Fletcher's "bald assertion" that his defense was impaired could not be credited "without further detail." *Id.* at 17.

After the case was indicted in this court, it was first assigned to Judge McFadden, who set a trial for May 18, 2026, and made clear that trial would begin on that date. *See* Min. Order (Nov. 24, 2025); *see also* Min. Order (Mar. 9, 2026). Due to his trial calendar and to ensure trial begins on time, Judge McFadden reassigned this case to the undersigned. *See* Min. Order (Mar. 18, 2026).

## II.    MOTION TO DISMISS CASE

Defendants first move to dismiss the entire case.  *See* Defs.' Mot. to Dismiss Case, ECF

No. 36.[6]  They repeat Fletcher's argument in Superior Court—already rejected by Judge Ryan—

that the Government's decision to move this case to federal court violates their Sixth

Amendment right to a speedy trial.  *See id.* at 5–8.  Alternatively, they urge this court to use its

supervisory powers to dismiss the case for "unnecessary delay" in "bringing [] defendant[s] to

trial" under Federal Rule of Criminal Procedure 48(b)(3).   Defs.' Mot. to Dismiss Case at 8–10.

Finally, they accuse the Government of vindictive prosecution.  *See id.* at 10–13.  Because these

arguments lack merit, the court will DENY the motion.

### a.  Sixth Amendment Right

Although the Sixth Amendment guarantees "the accused . . . the right to a speedy . . .

trial," U.S. Const. amend. VI, it does not forbid all delay.  To the contrary, delays are

"consistent" with the speedy trial right, at least in many circumstances.  *Vermont v. Brillon*, 556

U.S. 81, 89 (2009) (cleaned up).  In assessing whether a particular delay violates the Sixth

Amendment, this court must balance the "length of delay, the reason for [it], the defendant's

assertion of his right, and prejudice to the defendant."  *United States v. Rice*, 746 F.3d 1074,

1081 (D.C. Cir. 2014) (quoting *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).  Under these

factors, Defendants have not been denied their right to a speedy trial.

#### i.  *Length of delay*

The first factor—length of the delay—"is actually a double enquiry."  *Doggett v. United*

*States*, 505 U.S. 647, 651 (1992).  "Simply to trigger a speedy trial analysis," a defendant must

---

[6]  This motion was initially filed by Fletcher, but the court granted White and Bynum's motions to join it at the status conference on April 2, 2026.  *See* White's Mot. to Join, ECF No. 55; Bynum's Mot. to Join, ECF No. 48.

first show that the delay "has crossed the threshold dividing ordinary from presumptively prejudicial delay." *Id.* at 651–52 (cleaned up). "If the accused makes this showing," the court must then consider "the extent to which the delay stretches beyond the bare minimum needed to trigger" the speedy trial analysis. *Id.* at 651.

The Sixth Amendment speedy trial clock started to run when the Government charged Defendants in Superior Court. *See United States v. Mills*, 925 F.2d 455, 464–65 (D.C. Cir. 1991) (The "Sixth Amendment analysis would comprehend the entire time span from the appellees' indictment in Superior Court to the dismissal of the federal charges against them, given that the same federal prosecutors controlled both prosecutions."), *vacated on other grounds*, 964 F.2d 1186 (D.C. Cir. 1992). Thus, for purposes of the Sixth Amendment, Defendants have experienced a nearly five-year delay in getting their case to trial.

That delay is plainly sufficient to trigger the speedy trial analysis. *See Doggett*, 505 U.S. at 652 n.1 ("[T]he lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year."). But it by no means compels the conclusion that Defendants' speedy trial right has been violated. "The length of delay . . . is necessarily dependent upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 530–31 (cleaned up). This case involves complex charges of the most serious nature—felony murder, conspiracy, armed robbery, and various firearms offenses—as well as numerous motions and multiple defendants. And "the delay that can be tolerated for . . . a serious, complex conspiracy charge" is "considerably" more than for "an ordinary street crime." *Id.* at 531; *see also United States v. Gaffney*, 812 F. Supp. 3d 49, 75–76 (D.D.C. 2025) ("[A] proceeding involving a single defendant should proceed more quickly than one with multiple defendants.").

### ii. Reason for delay

With respect to the second factor, the Supreme Court "instructs that 'different weights should be assigned to different reasons.'" *Brillon*, 556 U.S. at 90 (quoting *Barker*, 407 U.S. at 531). "Deliberate delay 'to hamper the defense' weighs heavily against the" Government. *Id.* (quoting *Barker*, 407 U.S. at 531). "More neutral reasons such as negligence or overcrowded courts weigh less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government[.]" *Id.* (cleaned up). "In contrast, delay caused by the defense weighs against the defendant" because delay "attributable to the defendant" is essentially a waiver of the speedy trial right. *Id.* (cleaned up). Notably, "delay caused by the defendant's counsel is also charged against the defendant," even if the lawyer is a public defender, because "once a lawyer has undertaken" a defendant's case, "the duties and obligations are the same." *Id.* at 91 (cleaned up).[7]

This court agrees with Judge Ryan that the delay in this case is "not principally of the government's making," but rather, "a significant portion of the delay is attributable to the defendants." Dismissal Order at 13. To start, there is no indication that the Government deliberately stalled the case to gain any sort of tactical advantage; to the contrary, the Government "vehemently" opposed Bynum's request for a continuance because the Government wanted to try the case more quickly. *See* Gov't Opp'n to Bynum's Mot. to Continue at 3, *United States v. Bynum*, 2021 CF1 003715 (D.C. Super. Ct. June 27, 2024). Judge Ryan properly credited the Government's explanation that it was moving the case to federal court to get to trial

---

[7] None of the Defendants have contended that any delay resulted "from a systemic breakdown in the public defender system." *Brillon*, 556 U.S. at 94. To the extent delays in the Superior Court resulted from Bynum's PDS attorney, the Government urged that Bynum be reassigned to a CJA attorney and Bynum did not seek this remedy.

more quickly. *See* Dismissal Order at 18 ("Based on the record before this Court, the government does not appear to be acting in bad faith . . . .  Rather, it appears the government [is trying] to move these matters towards trial more quickly than they would were they to remain on this calendar.").  Indeed, it appears that the Government's decision to move the case to federal court has in fact expedited the timeline for a joint trial.  When White announced his intention to seek a continuance of the December 2025 trial date, the Government understandably worried that, given the delay it had encountered each time the parties tried to schedule a trial, a joint trial in Superior Court would be pushed to late 2026 or 2027.  Since the case has been brought to federal court, it has proceeded expeditiously, and trial is set for May 2026.

Moreover, the initial delays due to the COVID-19 pandemic and the effect it had on the Superior Court's backlog "does not weigh heavily against the government" because the effects of the pandemic were largely beyond the Government's control.  *United States v. Vargas*, 97 F.4th 1277, 1292 (11th Cir. 2024).  Further, the initial trial date was due at least in part to the need to accommodate defense counsel availability.  And the nearly year-long delay due to Bynum's request for a continuance clearly cannot be blamed on the Government, particularly because both Fletcher and White acquiesced to that continuance.

Defendants respond that "because the government chose to try all three co-defendants jointly," it "bears responsibility for delays caused by the need to coordinate" schedules.  Defs.' Mot. to Dismiss Case at 6.  To start, this argument appears inconsistent with the D.C. Circuit's instruction in *Rice* that delays caused by a codefendant "cannot be blamed on . . . the government."  746 F.3d at 1082.  In any event, Bynum and White never sought to sever their case while in Superior Court, and Fletcher only sought to sever his case after nearly four years and in response to the Government obtaining an indictment in federal court.  If Defendants

genuinely believed that the joint trial was unfairly delaying the adjudication of their case, they could have moved at any point during those four years to seek a severance.  That they did not do so speaks louder than Fletcher's eleventh-hour motion for a severance.

Furthermore, there is a "strong" preference for the joint trial of codefendants who are charged with "participating in the same illegal acts" when those charges involve "much the same evidence" and "testimony of the same witnesses."  *United States v. Wilson*, 605 F.3d 985, 1016 (D.C. Cir. 2010) (quoting *United States v. Ford*, 870 F.2d 729, 731 (D.C. Cir. 1989)).  Indeed, the preference for joint trials "applies with particular force in conspiracy cases."  *United States v. Davenport*, 935 F.2d 1223, 1240 (11th Cir. 1991).  Therefore, to the extent the delays caused by the need to coordinate schedules are attributable to the Government, that "must be balanced against the importance of conducting joint trials in conspiracy cases, which offsets to some extent the government's level of culpability."  *Id.*; *cf. Barker*, 407 U.S. at 531 ("[A] valid reason . . . should serve to justify appropriate delay.").  In sum, although the Government bears responsibility for delay attributable to the Superior Court's backlog and perhaps some responsibility for delay attributable to its decision to try the case jointly, this factor does not weigh strongly against the Government.

### iii.  Defendants' assertion of their rights

"The third factor"—Defendants' assertion of their rights—"cuts decidedly against [Defendants] because [they] did not raise any" speedy trial challenge—constitutional or otherwise—until after nearly four years and only when the Government indicted their case in federal court.  *Rice*, 746 F.3d at 1082.  Although Defendants invoked their right to a speedy trial at their presentment in Superior Court in July 2021, their subsequent requests for or acquiescence

to delays over the course of several years undercuts any claim that they actively asserted their speedy trial right.

### iv.  Prejudice to Defendants

Finally, the Sixth Amendment seeks to "limit the possibility that the defense will be impaired," "minimize anxiety and concern of the accused," and "prevent oppressive pretrial incarceration." *Barker*, 407 U.S. at 532.  The court acknowledges the detrimental impacts of pretrial incarceration and the stress of waiting for a trial, neither of which is lightly dismissed. The pretrial incarceration in this case, however, is amply justified by the nature of the crimes charged, the weight of the evidence against Defendants, Defendants' criminal history, and the danger they pose to the community.  Moreover, as noted above, the length of both the detention and delay is "not principally of the government's making," but rather significantly "attributable to the defendants."  Dismissal Order at 13.

As to Defendants' claim that the decision to move the case to federal court unduly interfered with their Sixth Amendment right to counsel and otherwise impaired their defense preparations, the court is not persuaded.  As a threshold matter, this alleged prejudice sits uneasily within the speedy trial framework, which analyzes whether *delay* has impaired the defense.  Here, however, the change in counsel was a consequence of the Government's decision to bring the case in federal court—a decision made to avoid further delay in Superior Court. Defendants thus seek to charge the Government with prejudice flowing not from delay, but from the Government's efforts to reduce it.

In any event, Defendants' assertion that their right to counsel has been impaired is hard to credit because they are represented by experienced federal practitioners, each of whom has repeatedly represented to the court that they are ready for trial on May 18.  The quantity and

quality of the defense motions filed further belies any suggestion that Defendants are receiving anything but vigorous and thorough representation.  Moreover, although Defendants may have wished to retain their Superior Court lawyers, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure a defendant will inexorably be represented by the lawyer whom he prefers."  *Wheat v. United States*, 486 U.S. 153, 159 (1988).  And it is worth noting that no substantive motions had been litigated in Superior Court, no substantive issues had been decided, and the Government moved the case to federal court nearly six months before the December 2025 trial date—which was itself likely to be continued—so it is unclear how much trial preparation had been accomplished by the defense lawyers in Superior Court.

Finally, Defendants argue in a footnote that the Government's "delay has also hampered *recently appointed* defense counsels' ability to investigate this case fully" because "[w]itnesses have long scattered and video from the scene likely no longer exists."  Defs.' Mot. to Dismiss Case at 10 (emphasis added).  But Defendants were charged the day after the robbery and have been continuously represented by counsel since.  To the extent certain investigative steps were not taken by prior counsel, that is attributable to prior defense counsel, not to any delay by the Government.  *Cf. Brillon*, 556 U.S. at 90–91 (choices made by defense counsel are charged to the defendant).  More fundamentally, it is inconsistent for Defendants to simultaneously claim harm from the loss of prior counsel while complaining, in effect, that prior counsel failed to take investigative steps that may have been useful.  In sum, although pretrial detention and the stress of awaiting trial are real burdens, the prejudice factor does not meaningfully weigh in Defendants' favor.  On balance, then, the *Barker* factors do not establish any violation of Defendants' Sixth Amendment right to a speedy trial.

b.  **Federal Rule of Criminal Procedure 48(b)(3)**

Federal Rule of Criminal Procedure 48(b)(3) permits the court to dismiss an indictment "if unnecessary delay occurs in . . . bringing a defendant to trial." This Rule "is a restatement of the inherent power of the court to dismiss a case for want of prosecution." *Mann v. United States*, 304 F.2d 394, 398 (D.C. Cir. 1962) (cleaned up). "The sanction of dismissal with prejudice, however, is a harsh remedy for enforcement of those [supervisory] powers," one which "override[s] the interests of victims and the public interest in the enforcement of the criminal law." *United States v. Goodson*, 204 F.3d 508, 514 (4th Cir. 2000). Thus, a "Rule 48(b) dismissal should be imposed only in extreme circumstances." *United States v. Parga-Rivas*, 689 F. Supp. 2d 25, 30 (D.D.C. 2009) (quoting *United States v. Huntley*, 976 F.2d 1287, 1291 (9th Cir. 1992)); *see also United States v. Jones*, 433 F.2d 1176, 1181–82 (D.C. Cir. 1970) ("The supervisory power doctrine is an extraordinary one which should be sparingly exercised." (cleaned up)). Indeed, "only when the interests of justice are best served by dismissal can this harsh sanction be consonant with the role of the courts." *Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir. 1993) (cleaned up). At the same time, Rule 48(b) "permits dismissal for unnecessary delays" which fall short of a Sixth Amendment or Speedy Trial Act violation. *United States v. Gaffney*, 812 F. Supp. 3d 49, 68 (D.D.C. 2025) (citing *Mathies v. United States*, 374 F.2d 312, 314–15 (D.C. Cir. 1967)). "The fundamental question is whether, given the circumstances of [the] case, the delay was 'unnecessary.'" *Id.* at 81 (quoting Fed. R. Crim. Pro. 48(b)).

Defendants argue that the Government's decision to move the case to federal court caused unnecessary delay and therefore warrants dismissal under Rule 48(b)(3). *See* Defs.' Mot. to Dismiss Case at 8. That argument fails because there is no evidence that the Government's

decision to move the case caused any delay in bringing this case to trial; to the contrary, the Government's decision probably avoided the further delay that likely would have occurred in Superior Court given White's forthcoming request for a continuance. *See supra* Part II.A. To the extent the move delayed Fletcher's trial since he requested to sever his case after the Government moved to dismiss in Superior Court, that relatively short delay was warranted, and it does not merit the harsh, extraordinary remedy of dismissal. Given the strong preference for joint trials in conspiracy cases, the Government's decision to try this case jointly is legitimate. *See Wilson*, 605 F.3d at 1016; *see also Davenport*, 935 F.2d at 1240.[8]

## C. Vindictive Prosecution

Finally, Defendants contend that the Government engaged in vindictive prosecution by threatening to seek a superseding indictment if Fletcher's counsel sought to continue the May 18, 2026 trial date. *See* Defs.' Mot. to Dismiss Case at 10. Specifically, after this case was indicted in federal court, Assistant Federal Public Defender Alexis Gardner was assigned to represent Fletcher. In November 2025, Judge McFadden set the May trial date. *See* Min. Order (Nov. 24, 2025). Two months later, in January 2026, Gardner left the Federal Public Defender's Office, and Eugene Ohm was assigned to replace her even though he was not available for the May trial. *See* Defs.' Mot. to Dismiss Case at 4. At some point in January or February 2026, Ohm informed the Government that he intended to seek a continuance and suggested a trial in June or September 2026. The Government responded that it might seek a superseding indictment charging Defendants with Hobbs Act robbery and/or Use of a Firearm During a Crime of Violence Resulting in Death under 18 U.S.C. § 924(j) if Fletcher moved to continue. *See id.*; *see*

---

[8] Although a delay need not rise to a Sixth Amendment violation to warrant relief under Rule 48(b), Defendants' Rule 48(b) argument nevertheless fails for many of the same reasons described *supra* Part II.A.

*also* Gov't Opp'n to Defs.' Mot. to Dismiss Case at 25, ECF No. 73.[9]  To avoid the risk of a superseding indictment, the Federal Public Defender decided not to seek a continuance and instead replaced Ohm with Fletcher's current lawyers, Elizabeth Mullin and Mary Petras, who are available for the May 18 trial, though they represent that they have had to scramble to prepare.  *See* Defs.' Mot. to Dismiss Case at 4.  On these facts and for the following reasons, Defendants have failed to make out a vindictive prosecution claim.

"The Due Process Clause prohibits prosecutors from . . . retaliat[ing] against a defendant for exercising a legal right."  *United States v. Slatten*, 865 F.3d 767, 798–99 (D.C. Cir. 2017); *see also United States v. Safavian*, 649 F.3d 688, 692 (D.C. Cir. 2011) ("The doctrine of prosecutorial vindictiveness . . . precludes action by a prosecutor that is designed to penalize a defendant for invoking any legally protected right[.]" (cleaned up)).  "At the same time, however, prosecutors have broad discretion to enforce the law, and their decisions are presumed to be proper absent clear evidence to the contrary."  *Slatten*, 865 F.3d at 799 (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).  "Thus, to succeed on a claim of vindictive prosecution, a defendant must establish that the increased charge was 'brought *solely* to penalize him and could not be justified as a proper exercise of prosecutorial discretion.'"  *Id.* (quoting *United States v. Goodwin*, 457 U.S. 368, 380 n.12 (1982)) (emphasis in original) (cleaned up).

Notably, "the Supreme Court has distinguished between pre-trial and post-trial settings." *Slatten*, 865 F.3d at 799.  "In a pre-trial setting, 'the prosecutor's assessment of the proper extent of prosecution may not have crystallized,' so an increase in charges may be the result of additional information or further consideration of known information, rather than a vindictive

---

[9]  Defendants make much of the fact that 18 U.S.C. § 924(j) is a death-penalty eligible offense, but they do not represent that the Government indicated it might seek the death penalty, nor does that seem plausible on these facts.  *See* Defs.' Mot. to Dismiss Case at 4.

motive." *Id.* (quoting *Goodwin*, 457 U.S. at 381).  "A prosecutor should remain free before trial

to exercise the broad discretion entrusted to him to determine the extent of the societal interest in

prosecution," as "the initial charges . . . may not reflect the extent to which an individual is

legitimately subject to prosecution."  *Goodwin*, 457 U.S. at 382.  "The routine exercise of many

pre-trial rights also weakens any inference of vindictiveness, *i.e.*, that a prosecutor would

retaliate simply because a defendant sought a jury trial or pleaded an affirmative defense."

*Slatten*, 865 F.3d at 799.  "On the other hand, a post-trial increase in charges is unlikely to be

based on new information, and thus it is much more likely to be improperly motivated than is a

pretrial decision.'"  *Id.* (quoting *Goodwin*, 457 U.S. at 381).  "For this reason, a presumption of

vindictiveness" applies when "charges are increased post-trial, but in the pre-trial context, a

defendant must provide additional facts sufficient to show that 'all of the circumstances, when

taken together, support a realistic likelihood of vindictiveness.'"  *Id.* (quoting *United States v.*

*Meyer*, 810 F.2d 1242, 1245–46 (D.C. Cir. 1987)).

Because the alleged retaliation occurred before trial, Defendants are not entitled to a

presumption of vindictiveness.  And on this record, they have failed to furnish facts sufficient to

show a realistic likelihood that the Government's warning that it might seek a superseding

indictment if the May trial date was continued was meant "*solely* to penalize" Defendants in the

event Fletcher sought a continuance.  *Slatten*, 865 F.3d at 799 (quoting *Goodwin*, 457 U.S. at 380

n.12) (emphasis in original).  To the contrary, the Government informed defense counsel as early

as June 2025—at least seven months before Ohm indicated his plans to seek a continuance—that

it was "considering a potential Superseding Indictment which would replace all the D.C. Code

offenses with their Federal counterpart.  For example, the D.C. Code Robbery While Armed

charge would be replaced by Hobbs Act Robbery [], and the D.C. Code [Possession of a Firearm

During a Crime of Violence] would be replaced by Discharging, Brandishing, Using, and Carrying a Firearm During and in Relation to a Crime of Violence."  Gov't Ex. 1, ECF No. 74-1. The Government reiterated the possibility of a superseding indictment in October 2025.  Gov't Ex. 2, ECF No. 74-2.  That it was contemplating such a move many months before it mentioned it in response to Ohm's intention to seek a continuance seriously undercuts the claim that the Government would have sought a superseding indictment solely to penalize Defendants.  The record instead reflects the Government's ongoing evaluation of whether Defendants' conduct warranted more serious charges, a possibility the Government indicated it might pursue if a continuance afforded it additional time to do so.  In reaching this conclusion, the court remains mindful of the Supreme Court's instruction that the Government "should remain free" at the pre-trial stage to exercise its charging discretion, *Goodwin*, 457 U.S. at 382, and the D.C. Circuit's instruction that the U.S. Attorney in this District enjoys "free rein" to bring federal charges in lieu of D.C. charges, so long as the facts support the charges.  *United States v. Clark*, 8 F.3d 839, 842 (D.C. Cir. 1993).

Finally, Defendants emphasize that the Government's warning forced the Federal Public Defender to substitute counsel, and that replacement counsel have had to scramble to prepare. The court does not minimize that consequence.  But under *Goodwin*, the pre-trial vindictiveness inquiry focuses on whether the prosecutor's sole motive was retaliatory, not the downstream effect that prosecutorial charging decisions might have on defense strategy and preparation.  457 U.S. at 381.  Because the record shows that the Government began contemplating a superseding indictment long before the dispute over a continuance request arose, there are not "facts sufficient to . . . 'support a realistic likelihood of vindictiveness.'"  *Slatten*, 865 F.3d at 799

(quoting *Meyer*, 810 F.2d at 1245–46).  Therefore, Defendants' Motion to Dismiss the Case will be DENIED.

### III.    MOTION TO DISMISS COUNT SEVEN

Defendants next move to dismiss the felony murder charge on the ground that it violates the Due Process Clause of the Fifth Amendment.  *See* Defs.' Mot. to Dismiss Count Seven at 1, ECF No. 35.[10]  Because this argument has little to no legal support, Defendants' motion will be DENIED.

Under D.C.'s felony murder law, a person is guilty of murder in the first degree if, "being of sound memory and discretion," he "*without purpose to do so* kills another in perpetrating or in attempting to perpetrate" certain enumerated felonies, including "robbery."  22 D.C. Code § 2101 (emphasis added).  Congress enacted this provision in 1901 to codify the common law approach to felony murder that D.C. courts had applied since 1801.  *United States v. Heinlein*, 490 F.2d 725, 736 (D.C. Cir. 1973); *see also Byrd v. United States*, 500 A.2d 1376, 1385 (D.C. 1985).  Under that longstanding approach, a person need not have the intent to kill to be liable for felony murder.  *Byrd*, 500 A.2d at 1384; *see also Heinlein*, 490 F.2d at 735.  Instead, the mens rea of malice "is implied from the intentional commission of the underlying felony even though the actual killing might be accidental."  *Byrd*, 500 A.2d at 1386 (quoting *Shanahan v. United States*, 354 A.2d 524, 526 (D.C. 1976)).  "[T]he common law principle which imputes malice as an element common to felony murder" is neither "far-fetched" nor "a strained legal fiction . . . where a person engaged in a robbery attempt uses a deadly weapon to accomplish his objective."  *Towles v. United States*, 521 A.2d 651, 657 (D.C. 1987) (cleaned up).  Although the

---

[10]  The motion was filed by Fletcher, but the court has granted Bynum and White's motions to join it at the April 2 status conference.  *See* Bynum's Mot. to Join, ECF No. 47; White's Mot. to Join, ECF No. 57.

perpetrator "may not have brought such weapon . . . for the purpose of killing his victim, surely the use of [the] pistol evidences intent to kill if necessary." *Id.*

Similarly, under the common law approach to felony murder that Congress codified into the D.C. Code in 1901, a person "who neither killed nor had any intent to kill, but only took part knowingly in the commission of a felony" was liable for first-degree murder. *Heinlein*, 490 F.2d at 736. Thus, D.C. law provides that "in a felony murder case, [] an accomplice does not escape liability for a foreseeable death merely because he or she neither intended to kill nor pulled the trigger." *Wilson-Bey v. United States*, 903 A.2d 818, 835 (D.C. 2006). Rather, an "accomplice who aids and abets the commission of a felony is legally responsible as a principal for all acts which are in furtherance of the common design or are the natural and probable consequences of acts done in the perpetration of the felony." *Id.* (quoting *Heinlein*, 490 F.2d at 735) (cleaned up). "To hold otherwise would be to reject the underlying purpose of the felony murder doctrine, which is designed to deter the commission of certain especially dangerous felonies because these particular crimes create an unacceptably high risk of death[.]" *Id.*

Defendants' due process challenge to D.C.'s felony murder statute "must surmount a high bar." *Kahler v. Kansas*, 589 U.S. 271, 279 (2020). "Under well-settled precedent," a rule of criminal liability "violates due process only if it 'offends some principle of justice deeply rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Id.* (quoting *Leland v. Oregon*, 343 U.S. 790, 798 (1952)); *see also City of Grants Pass v. Johnson*, 603 U.S. 520, 541 (2024) (noting that this standard applies to the due process analysis under both the Fifth and Fourteenth Amendments); *Kincaid v. District of Columbia*, 854 F.3d 721, 726 (D.C. Cir. 2017) (clarifying that the District of Columbia is subject to the Due Process Clause of the Fifth Amendment, not the Fourteenth, but the same due process analysis applies). The "primary guide

in applying that standard is historical practice," and courts look to "eminent common-law authorities (Blackstone, Coke, Hale, and the like), as well as to early English and American judicial decisions." *Kahler*, 589 U.S. at 279.

D.C.'s felony murder law is too deeply rooted in the common law to violate due process. *See McMillan v. Gomez*, 19 F.3d 465, 470 (9th Cir. 1994) ("The felony murder rule is too deeply rooted in Anglo-American jurisprudence to be questioned now."). Indeed, D.C.'s rule stretches back to the common law that D.C. courts have applied since 1801. *Heinlein*, 490 F.2d at 736. And the doctrinal underpinnings of that rule "can be traced back" even further to the eminent common law authority "Lord Coke." *State v. Clark*, 652 S.W.3d 123, 125 (Mo. 1983). Contrary to Defendants' contention, the felony murder rule does not impermissibly circumvent the requirement of mens rea. "The defendant's intent, which the prosecution must still prove, relates to the other felony rather than the murder." *McMillan*, 19 F.3d at 470. And from the intent to commit that other especially dangerous felony, the law sensibly infers the malice necessary to be guilty of murder, *see Towles*, 521 A.2d at 657, that is, "a wanton disregard for human life." *Logan v. United States*, 483 A.2d 664, 671 (D.C. 1984); *see also State v. Burkhart*, 103 P.3d 1037, 1046 (Mont. 2004) ("[T]he intent to commit the felony supplies the intent for all the consequences, including homicide, arising therefrom."). Unsurprisingly, then, the Supreme Court has long said that the power "to enact felony-murder statutes is beyond constitutional challenge," as is the power "to make aiders and abettors equally responsible as a matter of law." *Lockett v. Ohio*, 438 U.S. 586, 602 (1978).

Fletcher and Bynum's reliance on *Rosemond v. United States*, 572 U.S. 65 (2014), is misplaced. That case interpreted the federal aiding and abetting statute as applied to 18 U.S.C. § 924(c), which forbids the use of a firearm during a drug trafficking offense. *Id.* at 71.

*Rosemond* was thus a statutory interpretation case that did not establish any rule of constitutional dimension, so it does not speak to Defendants' due process claim at all.  Even as a statutory matter, Congress drafted § 924(c) and D.C.'s felony murder statute differently, and that difference explains why *Rosemond* does nothing to upset D.C.'s felony murder law.  In § 924(c), Congress imposed two *mens rea* requirements—one for the predicate drug trafficking offense and one for the use of the firearm.  Thus, because the principal must satisfy both *mens rea* requirements, *Rosemond* sensibly held that an accomplice must too.  In codifying the common law of felony murder at 22 D.C. Code § 22-2101, by contrast, Congress provided that a defendant's *mens rea* for the predicate felony supplies the *mens rea* for the killing—one *mens rea* requirement, not two.  So, consistent with *Rosemond*, because a principal need only intend the predicate felony, that is all the accomplice must intend too.  In sum, *Rosemond* construed a statute Congress wrote much differently; it did not somehow silently upend D.C.'s centuries-old felony murder law.

## IV.    MOTION TO SUPPRESS ANKLE MONITOR EVIDENCE

Fletcher moves to suppress all evidence obtained from the GPS monitor placed on his ankle in May 2021 by his Community Supervision Officer ("CSO") as a sanction for his noncompliance with his conditions of supervised release.  *See* Fletcher's Mot. to Suppress, ECF No. 34.  He points to the D.C. Court of Appeals' decision in *Davis v. United States*, 306 A.3d 89 (2023), in which a two-judge majority held that CSOSA lacked statutory authority to issue a regulation allowing CSOs to temporarily place electronic monitors on noncompliant supervisees, and therefore that regulation was not a reasonable one on which a Fourth Amendment special needs search could be based.  *Davis*, 306 A.3d at 92.  But *Davis* did not consider whether CSOSA's electronic monitoring regulation was based on "a reasonable mistake of law" under

*Heien v. North Carolina*, 574 U.S. 54, 61 (2014), and therefore CSOSA's regulation—albeit mistaken—was still a reasonable one capable of supporting a special needs search. This court is persuaded by that argument, and therefore concludes that the CSO's placement of a GPS monitor on Fletcher's ankle did not violate the Fourth Amendment. But even if it did, this court would still decline to suppress the resulting evidence because the CSO reasonably relied on CSOSA's objectively reasonable regulation, and there is no evidence of misconduct or negligence by CSOSA.

### A. CSOSA's Authority to Place Ankle Monitors on Noncompliant Supervisees

In 1997, Congress made all D.C. offenders on supervised release "subject to the authority of the United States Parole Commission." National Capital Revitalization and Self-Government Act of 1997, Pub. L. No. 105-33, § 11233(c)(2) (codified at 24 D.C. Code § 133(c)(2)). At the same time, Congress created CSOSA and tasked it with the "supervision" of "offenders on probation, parole, and supervised release." *Id.* § 11233(c)(1) (codified at 24 D.C. Code § 133(c)(1)). In dividing responsibility between the two agencies, Congress gave the Parole Commission "the same authority as is vested in the United States district courts" by 18 U.S.C. § 3583, and CSOSA "the same powers and authority as are granted by law to United States Probation and Pretrial Officers." 24 D.C. Code § 133(c)(2), (d). In the federal system, it is generally recognized that only a district court can impose discretionary conditions of supervised release. *See, e.g.*, *United States v. Matta*, 777 F.3d 116, 122 (2d Cir. 2015). Thus, at first blush, it would seem that only the Parole Commission—not CSOSA—could place a GPS monitor on a supervisee.

Yet Congress also empowered CSOSA to "develop and operate intermediate sanctions programs for sentenced offenders." Pub. L. No. 105-33, § 11233(b)(2)(F) (codified as amended

at 24 D.C. Code § 133(b)(2)(F)).  And for over two decades, both the Parole Commission and CSOSA understood this provision as giving CSOSA statutory authority to impose intermediate sanctions[11] on supervisees who violated their release conditions, and both agencies further agreed that temporary electronic monitoring was a permissible intermediate sanction. Specifically, in 2000, the Commission promulgated an interim rule requiring each supervisee to "submit to the sanctions imposed by his [CSO] within the limits established by the CSOSA Administrative Sanctions Schedule [] if the [CSO] finds that the releasee . . . has committed any non-criminal violation of the conditions of supervised release."  65 Fed. Reg. 70,466, 70,469 (Nov. 24, 2000).  The Parole Commission specifically noted that "sanctions may include . . . curfew with electronic monitoring."  *Id.*

CSOSA, in turn, issued an interim rule in 2001 establishing an administrative sanctions schedule that included "electronic monitoring for a specified period of time."  66 Fed. Reg. 48,336, 48,338 (Sept. 20, 2001).  Following notice and comment, CSOSA finalized this rule in 2003, noting that intermediate sanctions allowed CSOSA "to provide swift, certain, and consistent responses to noncompliant behavior," and to "reduce the number of violation reports sent to . . . the sentencing court or the United States Parole Commission."  68 Fed. Reg. 19,738, 19,738 (Apr. 22, 2003).  Although the language of the regulations changed slightly over the years, CSOSA continuously maintained—without challenge—the authority to impose temporary electronic monitoring on supervisees who violated their conditions until the *Davis* decision in 2023, and the Parole Commission continued to require supervisees to comply with such intermediate sanctions.  *See* 28 C.F.R. § 2.204(a)(6)(vi) (2023) (Parole Commission regulation

---

[11]  An intermediate sanction is a response to a release violation that is more than a warning but less than revocation or a more formal and restrictive condition on release.

requiring CSOSA supervisees to "comply with the sanction(s) imposed by the supervision officer and as established by an approved schedule of graduated sanctions"); 28 C.F.R. § 810.3 (2023) (CSOSA regulation allowing CSOs to impose "electronic monitoring for a specified period of time" if they had "reason to believe [the supervisee was] failing to abide by the general or specific conditions of release").

During this more than two-decade period, CSOSA repeatedly informed Congress that it placed non-compliant supervisees on GPS monitoring at its own discretion. *See Davis*, 306 A.3d at 114–15 (Thompson, J., dissenting) (collecting examples). Yet Congress never suggested that CSOSA was acting in excess of its statutory power. To the contrary, when Congress re-enacted CSOSA's authority to develop and operate a program of intermediate sanctions in 2016, the Senate Committee on Homeland Security and Governmental Affairs expressed its understanding that CSOSA "has specific statutory authority to punish sentenced offenders" who violate their release conditions. *See* S. Rep. No. 114-110, at 2 (2015).

Moreover, before *Davis*, the D.C. Court of Appeals had repeatedly suggested in dicta that CSOSA could impose intermediate sanctions like temporary electronic monitoring. For example, in *Hunt v. United States*, a unanimous panel distinguished conditions of release, which CSOSA could not impose, from "intermediate sanctions," including "electronic monitoring for a specified period," which the court indicated CSOSA could impose. 109 A.3d 620, 621–22 (D.C. 2014). The *Hunt* court further quoted with approval CSOSA's regulation that "[s]anctions 'can be applied short of court or [Parole Commission] approval'" and that sanctions "enable CSOSA to 'provide swift, certain, and consistent responses to noncompliant behavior.'" *Id.* at 622 (quoting 68 Fed. Reg. at 19,738). And in *United States v. Jackson*, another unanimous D.C. Court of Appeals panel held "that CSOSA's imposition of GPS monitoring on Mr. Jackson

without judicial authorization was a constitutional 'special needs' search." 214 A.3d 464, 467

(D.C. 2019). The *Jackson* court likewise discussed CSOSA's intermediate sanctions regulation

with approval, although the court did not directly uphold that regulation. *See id.* at 475–76

("CSOSA was directed by law to develop and operate intermediate sanctions for . . . sentenced

offenders under its supervision. The regulations that CSOSA promulgated to that end . . .

provide that if a Community Supervision Officer (CSO) has reason to believe a supervisee is

failing to abide by the general or specific conditions of release . . . , the CSO may address the

problem by imposing one or more administrative sanctions." (cleaned up)).

The divided decision in *Davis* thus significantly altered the status quo that had existed

unchallenged for over two decades. A two-judge majority held that CSOSA's regulation

allowing Community Supervision Officers to impose temporary GPS monitoring as an

intermediate sanction "exceeds its statutory authority." *Davis*, 306 A.3d at 99. The majority

concluded that "the Parole Commission has the sole authority to impose or modify conditions of

supervised release." *Id.* at 101. Although the majority assumed that CSOSA held "some

authority . . . to administratively sanction" supervisees,[12] it rejected the argument that temporary

GPS monitoring was an intermediate sanction short of a condition of release. *Id.* at 104–08. The

majority reasoned in part that treating temporary GPS monitoring as an intermediate sanction

would unduly encroach on the Parole Commission's power over conditions of release, *id.* at 104,

even though all CSOSA sanctions "remain[ed] subject to the Commission's override or

modification." *Id.* at 107. The majority went on to conclude that because CSOSA lacked

statutory authority to promulgate the regulation, the regulation could not "substitute for the

---

[12] Although the majority suggested without deciding that the authority to develop and operate intermediate sanctions did not entail the authority to impose such sanctions, that suggestion is not persuasive for the reasons articulated by Judge Thompson. *See Davis*, 306 A.3d at 118–19.

warrant and probable cause requirements of the Fourth Amendment" under the special needs doctrine, and therefore the GPS monitor constituted an unlawful search. *Id.* at 92; *see also id.* at 110 ("CSOSA's electronic monitoring regulation is not a reasonable regulation on which a special needs search may be based.").

In a persuasive dissent, Judge Thompson strongly disagreed. She noted that the statutory provision giving CSOSA "'the same powers and authority as are granted by law to United States Probation and Pretrial Officers'" did not say CSOSA "shall have *only* 'the same powers and authority as are granted by law to'" Probation and Pretrial Officers. *See Davis*, 306 A.3d at 120 (Thompson, J., dissenting) (emphasis in original) (quoting 24 D.C. Code § 133(d)). To the contrary, Congress separately empowered CSOSA to "develop and operate intermediate sanctions . . . programs." 24 D.C. Code § 133(b)(2)(F). Judge Thompson further noted that Congress was "well aware" that CSOSA interpreted this authority as allowing it to impose temporary GPS monitoring on noncompliant supervisees as an intermediate sanction and that the Senate Committee on Homeland Security and Governmental Affairs had explicitly expressed approval of CSOSA's interpretation around the same time that Congress re-enacted CSOSA's intermediate-sanctions authority. *See Davis*, 306 A.3d at 113, 116 (Thompson, J., dissenting). Judge Thompson thus would have applied the well-established principle that "[w]here an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." *Id.* at 116 (quoting *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982)). And she reasoned that although GPS monitoring "for the entire supervision period" would constitute a condition of release, "relatively short-term GPS monitoring . . . imposed only as a sanction for [a

supervisee's] violation of his conditions of release" "fit[s] quite comfortably within the rubric of an 'intermediate' sanction." *Id.* at 117–18.

This court defers to the *Davis* majority's conclusion that CSOSA lacked statutory authority for its electronic monitoring regulation because that conclusion is rooted in the interpretation of the D.C. Code. *See Williams v. Johnson*, 776 F.3d 865, 869 (D.C. Cir. 2015) ("We defer to the District of Columbia Court of Appeals' interpretation of the D.C. Code."). The question remains, however, whether CSOSA's regulation was nevertheless reasonable because it was based on a reasonable mistake of law and could therefore still support a special needs search. *See Heien*, 574 U.S. at 61 (reasonable mistake of law does not render search or seizure unlawful); *see also Jackson*, 214 A.3d at 480–81 (search conducted pursuant to a reasonable regulation of probation supervisees is a reasonable search under the special needs doctrine). The D.C. Court of Appeals has never decided that question. *See United States v. Wells*, 341 A.3d 1096, 1112 n.6 (D.C. 2025). And even if it had, this court is not bound by the D.C. Court of Appeals on questions of federal constitutional law. *See United States v. Castle*, 825 F.3d 625, 634 (D.C. Cir. 2016).

### B. Reasonable Mistake of Law

As the Supreme Court has repeatedly made clear, "'the ultimate touchstone of the Fourth Amendment is reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" *Heien*, 574 U.S. at 60–61 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). Where law enforcement bases a search or seizure on a mistake of fact or law, that mistake does not invalidate a resulting search

or seizure so long as the mistake was reasonable. *Id.* at 61. "[T]he test for a reasonable mistake of law is satisfied 'when the law at issue is so doubtful in construction that a reasonable judge could agree with the officer's view.'" *United States v. Person*, 754 F. Supp. 3d 231, 249 (D.D.C. 2024) (quoting *Heien*, 574 U.S. at 70 (Kagan, J., concurring)).

Here, the search of Fletcher's person effected by his ankle monitor was based on CSOSA's longstanding regulation which was, in turn, based on a reasonable mistake of law. CSOSA reasonably believed—as did the Parole Commission and two judges of the D.C. Court of Appeals—that it had statutory authority to impose intermediate sanctions, including temporary electronic monitoring, on noncompliant supervisees. *See Davis*, 306 A.3d at 112 (Thompson, J., dissenting) ("[T]he plain language of CSOSA's authorizing statute, its legislative history, and CSOSA's interpretation of its statutory mandate as made known to Congress all confirm CSOSA's statutory authority to operate its sanctions program."); *Wells*, 341 A.3d at 1116 (McLeese, J., dissenting) ("*Davis* was incorrectly decided for reasons well stated by the dissenting opinion in that case."); 65 Fed. Reg. at 70,469. Even though two other judges of the D.C. Court of Appeals ultimately overturned CSOSA's judgment, they needed to do "hard interpretive work" to get there, which further indicates that CSOSA's mistake of law was reasonable. *Heien*, 574 U.S. at 70–71 (Kagan, J., concurring) ("If the statute is genuinely ambiguous such that overturning the officer's judgment requires hard interpretive work, then the officer has made a reasonable mistake. . . . The critical point is that the statute poses a quite difficult question of interpretation and [the officer's] judgment, although overturned, had much to recommend it.").

Fletcher responds that "[e]rrors of law concerning the scope of the Fourth Amendment . . . can never support a search or seizure." Fletcher's Reply at 7–8, ECF No. 77. True enough.

*See Heien*, 574 U.S. at 69 n.1 (Kagan, J., concurring) ("I note in addition, as does the Court, that one kind of mistaken legal judgment—an error about the contours of the Fourth Amendment itself—can never support a search or seizure."). But CSOSA's mistake was not about the contours of the Fourth Amendment, it was about whether its statutory authority to "develop and operate intermediate sanctions" allowed it to impose temporary GPS monitoring on noncompliant supervisees. 24 D.C. Code § 133(b)(2)(F). That is a mistake about what the D.C. Code authorized, not a mistake about what the Fourth Amendment permitted.

In sum, CSOSA's reasonable mistake of law did not render its regulation unreasonable, and the search on Fletcher conducted pursuant to that regulation was therefore permissible under the Fourth Amendment's special needs doctrine. *See Jackson*, 214 A.3d at 480–81. But even if the ankle monitor violated the Fourth Amendment, it does not automatically follow that the evidence resulting from the monitor must be suppressed. The question would still remain whether the exclusionary rule—which often requires the suppression of evidence obtained in violation of the Fourth Amendment—applies in this case.

## C. The Exclusionary Rule

The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. But the Amendment itself "says nothing about suppressing evidence obtained in violation of [its] command." *Davis v. United States*, 564 U.S. 229, 236 (2011). The exclusionary rule emerged only in the 20th century as a judicially created "'prudential' doctrine" whose "sole purpose . . . is to deter future Fourth Amendment violations." *Id.* (quoting *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998)). Notably, the suppression of unlawfully obtained evidence "is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional

search." *Id.* (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)). Given that it has a single purpose—deterrence—the Supreme Court has "limited the [exclusionary] rule's operation to situations in which this purpose is 'thought most efficaciously served.'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). Thus, the exclusionary rule is "applicable only where" appreciable "deterrence benefits outweigh [the] substantial social costs." *Utah v. Strieff*, 579 U.S. 232, 237–38 (2016) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)); *see also Herring v. United States*, 555 U.S. 135, 141 (2009) (explaining that the exclusionary rule "applies only where it results in appreciable deterrence" (cleaned up)).

The social costs of suppressing evidence are indeed substantial. The exclusionary rule "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Davis*, 564 U.S. at 237. "And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Id.* "[L]etting guilty and possibly dangerous defendants go free" is "something that 'offends basic concepts of the criminal justice system." *Herring*, 555 U.S. at 141 (cleaned up). Thus, the "rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging its application." *Hudson*, 547 U.S. at 591. Although "society must swallow this bitter pill when necessary" to deter future Fourth Amendment violations, it must do so "only as a 'last resort.'" *Davis*, 564 U.S. at 237 (quoting *Hudson*, 547 U.S. at 591).

To that end, the Supreme Court has, in recent decades, required "a more rigorous weighing of [the exclusionary rule's] costs and deterrence benefits"—one that "focus[es] . . . on the 'flagrancy of the police misconduct.'" *Davis*, 564 U.S. at 237 (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong." *Id.*

(quoting *Herring*, 555 U.S. at 144).  The Court has also indicated that "recurring or systemic [police] negligence" may "[i]n some circumstances" be the sort of "sufficiently culpable" misconduct that warrants suppression.  *See Herring*, 555 U.S. at 144.  But "where a Fourth Amendment violation occurs in the absence of police misconduct, . . . the cost of excluding evidence outweighs any potential deterrent benefit" and application of the exclusionary rule is inappropriate.  *United States v. Thorne*, 169 F.4th 1117, 1123 (D.C. Cir. 2026); *see also Davis*, 564 U.S. at 238 ("[W]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . the deterrence rationale loses much of its force and exclusion cannot pay its way." (cleaned up)).

Fletcher does not dispute that his CSO acted in objectively reasonable, good faith reliance on CSOSA's electronic monitoring regulation.  *See* Fletcher's Reply at 2–3.  Fletcher argues only that the court should apply "the exclusionary rule to CSOSA's decision, *as an agency*, to promulgate" an unlawful regulation in order to "disincentivize the agency from implementing future policies that authorize unconstitutional searches."  *Id.* at 3 (cleaned up).  He further urges this court to follow the divided decision of the D.C. Court of Appeals in *United States v. Wells*, 341 A.3d 1096 (D.C. 2025), where, over the dissent of Judge McLeese, the same two judges who comprised the *Davis* majority applied the exclusionary rule to evidence obtained from a CSOSA-imposed GPS monitor.  But as another court in this District has explained, the *Wells* majority is neither binding nor persuasive.  *See* Hr'g Tr. at 7 (Feb. 9, 2026), *United States v. Jones*, No. 24-cr-35 (hereinafter "*Jones* Tr.") (citing *Castle*, 825 F.3d at 634 (noting that decisions of the D.C. Court of Appeals are "not binding" on Fourth Amendment questions)).  For the following reasons, this court is more persuaded by the reasoning of Judge McLeese's dissent and the court in *Jones*.  It was reasonable for the CSO to rely on CSOSA's objectively reasonable, good-faith

regulation, and the "harsh sanction of exclusion 'should not be applied to deter objectively reasonable law enforcement activity.'" *Davis*, 564 U.S. at 241 (quoting *Leon*, 468 U.S. at 919).

The court acknowledges, however, the legitimate concern raised by Fletcher and the *Wells* majority that it would be problematic to apply the good-faith exception to law enforcement agencies who enact regulations authorizing "constitutionally questionable searches" because "that would only incentivize law enforcement to push the Fourth Amendment envelope in systemic ways." *Wells*, 341 A.3d at 1108. Strategic, systemic envelope pushing would indeed be precisely the sort of "sufficiently deliberate" and "sufficiently culpable" bad faith conduct that would warrant deterrence. *Herring*, 555 U.S. at 144. But that is not the conduct at issue here, and the court need not decide whether the good-faith exception would extend to a typical law enforcement agency's reliance on its own regulations. CSOSA's regulation presents a distinctive case for at least three reasons which, taken together, avoid the parade of horribles that Fletcher and the *Wells* majority fear.

First, CSOSA did not aggressively overread its authority; its interpretation was "entirely reasonable." *Wells*, 341 A.3d at 1127 (McLeese, J., dissenting). Indeed, at least two judges of the D.C. Court of Appeals thought CSOSA's interpretation was not only reasonable but correct. *See Davis*, 306 A.3d at 112 (Thompson, J., dissenting); *see also Wells*, 341 A.3d at 1116 (McLeese, J., dissenting); *cf. Person*, 754 F. Supp. 3d at 249 ("[T]he test for a reasonable mistake of law is satisfied 'when the law at issue is so doubtful in construction that a reasonable judge could agree with the officer's view.'" (quoting *Heien*, 574 U.S. at 70 (Kagan, J., concurring))). CSOSA's interpretation emerged only after the Parole Commission first enacted a regulation interpreting the D.C. Code to give CSOSA authority to impose intermediate sanctions on noncompliant offenders, including electronic monitoring with a curfew. *See* 65 Fed. Reg. at

70,469.  And during the over two decades in which CSOSA's regulation was in place, the D.C.

Court of Appeals repeatedly discussed CSOSA's regulation and GPS monitoring program with

apparent approval and "without questioning its legality." *Jones* Tr. at 6.  Finally, even if

CSOSA's regulation was not reasonable when it was first promulgated, it was plainly reasonable

and in good faith for CSOSA to maintain that regulation after Congress appeared to ratify or at

least express approval of CSOSA's interpretation in 2016.  Even the *Davis* majority

acknowledged that Congress in 2016 seemed to have "understood" CSOSA's intermediate

sanctions authority "to have granted CSOSA 'specific statutory authority to punish sentenced

offenders.'"  306 A.3d at 103 (quoting S. Rep. No. 114-110 at 2).  Thus, CSOSA was not in any

meaningful sense pushing the envelope—it was reasonably interpreting its authority the same

way two appellate judges and the Parole Commission interpreted it.

Second, although CSOSA has law enforcement attributes and shares its GPS data with

the Metropolitan Police Department, CSOSA is by no means a typical, zealous law enforcement

agency.  As the Supreme Court has recognized, "[p]arole agents, in contrast to police officers,

are not 'engaged in the often competitive enterprise of ferreting out crime.'"  *Scott*, 524 U.S. at

368 (quoting *Leon*, 468 U.S. at 914).  Unlike normal law enforcement agencies, CSOSA is

concerned with "the distinctive probation mission" of rehabilitating offenders and encouraging

them to comply with the conditions of release.  *United States v. Jackson*, 214 A.3d 464, 475

(D.C. 2019).  Given this primary mission of offender rehabilitation, it is "unfair to assume that

the parole officer bears hostility against the parolee that destroys his neutrality."  *Scott*, 524 U.S.

at 368 (cleaned up).  CSOSA's relationship with offenders is intended to be supervisory rather

than adversarial.  *See id.*

Moreover, contrary to Fletcher's argument that the good-faith exception should only apply to reasonable police reliance "on the judgment of a neutral third party, such as a judge, a legislature, or a court clerk," or isolated and attenuated instances of police negligence, *see* Fletcher's Reply at 3, the Supreme Court has never required the judgment on which an individual officer relies to be from a strictly neutral third party. The Court in *Illinois v. Krull* acknowledged that legislators "are not neutral judicial officers." 480 U.S. 340, 350 (1987) (cleaned up). Indeed, legislators are often highly motivated to reduce crime for political reasons. *See id.* at 366 (O'Connor, J., dissenting) ("Providing legislatures a grace period during which the police may freely perform unreasonable searches in order to convict those who might have otherwise escaped creates a positive incentive to promulgate unconstitutional laws."). But the *Krull* Court nevertheless held that police could reasonably rely on a legislature's enactment to carry out an unconstitutional search. *Id.* at 350 (majority op.). In so holding, the Court emphasized that the role of legislators is to "enact statutes for broad, programmatic purposes, not for the purpose of procuring evidence in particular criminal investigations" and that legislatures engage in "deliberations" which "are significantly different from the hurried judgment of a law enforcement officer." *Id.* at 351–52.

In these significant respects, CSOSA is much closer to the legislature in *Krull* than it is to the typical law enforcement agency that Fletcher and the *Wells* majority worry about. CSOSA did not promulgate its intermediate sanctions regulation "for the purpose of procuring evidence in particular criminal investigations." *Krull*, 480 U.S. at 352. Instead, it was enacting a broad program to "directly serve the primary purposes of probation supervision" as distinct from the "normal need for law enforcement." *Jackson*, 214 A.3d at 476. Moreover, the regulation promulgated by CSOSA was not the product of "hurried judgment." *Id.* at 351. Rather, it went

through notice-and-comment rulemaking and was subject to oversight by both the Parole Commission and Congress. *See Wells*, 341 A.3d at 1108.

Finally, even if the court were to credit Fletcher's concerns regarding CSOSA's law enforcement attributes, CSOSA reasonably relied on the judgment of the Parole Commission, which interpreted the D.C. Code to give CSOSA the authority to impose intermediate sanctions on noncompliant supervisees, including curfew with electronic monitoring, *before* CSOSA reached that same conclusion, *see* 65 Fed. Reg. at 70,469, and then continued to direct supervisees to comply with CSOSA's administrative sanctions after CSOSA introduced its more expansive GPS monitoring program. *See, e.g.*, 79 Fed. Reg. 51,254, 51,259 (Aug. 28, 2014). The Parole Commission is a multi-member adjudicative body plainly more akin to a judiciary or legislature than it is to a police department, and even more removed from normal law enforcement than CSOSA. *See Cunningham v. District of Columbia*, 584 A.2d 573, 577 (D.C. 1990) ("Parole board officials perform functionally comparable tasks to judges . . . . Their duty is often the same: to render impartial decisions in cases and controversies that excite strong feelings because the litigant's liberty is at stake."). CSOSA's reliance on the Parole Commission was thus amply reasonable.

Taken together, these distinctive features of CSOSA's objectively reasonable regulation, and the absence of any deliberate, reckless, grossly negligent, or even negligent behavior show that the deterrence value of suppression would be slight and "exclusion cannot pay its way." *Davis*, 564 U.S. at 238 (cleaned up). Accordingly, Fletcher's Motion to Suppress the Ankle Monitor Evidence, ECF No. 34, will be DENIED.

## V.    MOTION TO SUPPRESS TANGIBLE EVIDENCE

Defendants next move to suppress the tangible evidence recovered after police located the gray Ford Fusion and detained Defendants. *See* Defs.' Mot. to Dismiss Tangible Evidence, ECF No. 43.[13]  Defendants contend that police lacked reasonable suspicion to stop them, and that their subsequent warrantless arrests were not supported by probable cause. *See id.* at 2.  Because officers plainly had reasonable suspicion to stop Defendants and probable cause to arrest them, Defendants' motion will be DENIED.[14]

"The Fourth Amendment protects against unreasonable seizures of the person." *United States v. Abdus-Price*, 518 F.3d 926, 930 (D.C. Cir. 2008).  Consistent with the Fourth Amendment, "a police officer may effect a brief seizure for investigative purposes . . . if he has 'a reasonable suspicion, grounded in specific and articulable facts, that a person was involved in or is wanted in connection with a completed felony.'" *Id.* (quoting *United States v. Hensley*, 469 U.S. 221, 229 (1985)).  Reasonable suspicion "is not a particularly high bar: 'a *Terry* stop requires only a minimal level of objective justification.'" *Id.* (quoting *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001)).

"The point at which an investigative stop becomes an arrest is not marked with a bright line." *Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017).  It depends on the length

---

[13] This motion was initially filed by Fletcher, but the court granted White and Bynum's request to join it. *See* Bynum's Mot. to Join, ECF No. 53; White's Mot. to Join, ECF No. 58.

[14] Defendants also move to suppress all statements made by Defendants in police custody as (1) involuntary and (2) un-*Mirandized*.  The Government has represented that it does not intend to introduce any of these statements at trial.  The Government has reserved the possibility that it may seek to introduce statements in which Fletcher mentions that he is wearing an ankle monitor, but only if the defense "opens the door through argument or testimony that [] Fletcher was not present or near the location." Gov't Opp'n at 8, ECF No. 70.  The court will address this issue if it becomes necessary.

and intrusiveness of the detention, among other things. *See id.* (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985)). But by the time a seizure ripens from a *Terry* stop to an arrest, officers need probable cause to believe that the suspect has committed or is committing a crime. *See Dunaway v. New York*, 442 U.S. 200, 208–09 (1979).[15] Probable cause requires more than reasonable suspicion. But like reasonable suspicion, probable cause "is 'not a high bar.'" *Thorne*, 169 F.4th at 1127 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). It demands less than fifty-percent certainty," *id.* (cleaned up), and "requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley*, 571 U.S. at 338 (cleaned up). In assessing both reasonable suspicion and probable cause, the court must consider "the totality of the circumstances" and avoid "divide-and-conquer analysis" which views each fact "in isolation." *District of Columbia v. Wesby*, 583 U.S. 48, 60–61 (2018) (cleaned up).

The court need not analyze when the investigative detention of Defendants ripened into an arrest. Officers plainly had probable cause to arrest Defendants as soon as they saw them in the gray Ford Fusion. Specifically, upon reviewing CCTV footage of the alleged robbery, Investigator Anderson and Detective Amengual both recognized Fletcher and Bynum as two of the men who robbed Miller. They also observed two of the suspects flee the scene in a gray Ford Fusion. They then tracked Fletcher to the 5000 block of Gay Street NE using his GPS ankle

---

[15] Probable cause that a criminal offense has been or is being committed is sufficient to support a warrantless arrest. *See United States v. Vinton*, 594 F.3d 14, 21 (D.C. Cir. 2010). The suspected offense need not be committed in the officers' presence to justify a warrantless arrest, at least if it is a felony. *See United States v. Gonzalez*, 107 F.4th 1304, 1309 (11th Cir. 2024) (noting that every Circuit to face the issue has held that neither a felony nor a misdemeanor needs to have been committed in the officers' presence to support a warrantless arrest); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 340 n.11 (2001) (reserving the question of whether "the Fourth Amendment entails an 'in the presence' requirement for purposes of misdemeanor arrests").

monitor data.  Once they arrived on Gay Street, they saw the gray Ford Fusion that had been used as a getaway vehicle and recognized Fletcher and Bynum as two of the car's occupants. Upon approaching the vehicle, the officers confirmed that Fletcher and Bynum were inside.  It was also apparent that the vehicle's third occupant, White, was one of the assailants in the CCTV footage.  Police therefore had probable cause to arrest Defendants before any detention began. Defendants do not challenge the subsequent search of the Ford Fusion, which was conducted pursuant to a warrant.  Their motion to suppress tangible evidence will therefore be DENIED.

## VI.    MOTION TO INTRODUCE ANKLE MONITOR EVIDENCE

Next, the Government seeks to introduce evidence that Fletcher was wearing an ankle monitor, as well as the underlying GPS data, to (1) place Fletcher at the scene of the crime, (2) identify Fletcher as the robber in the CCTV footage who is wearing such a device, and (3) explain how police located Fletcher and his codefendants in the Ford Fusion mere hours after the crime occurred.  *See* Gov't Mot. to Introduce Fletcher's Ankle Monitor Evidence Under Federal Rule of Evidence 404(b) at 7, ECF No. 31; *see also* Gov't Reply at 3, ECF No. 67.  Fletcher contends that this evidence is not admissible under Rule 404(b) and, in any event, it should be excluded under Rule 403.  *See* Fletcher's Opp'n at 1, ECF No. 46.  Because Fletcher's objections are not persuasive, the court will GRANT the Government's Motion.[16]

---

[16]  The court will DENY, however, the Government's untimely request to introduce testimony that on May 24, 2021, police stopped the gray Ford Fusion and observed Fletcher exit the driver's seat of the vehicle.  The Government concedes that it did not disclose this evidence in its Rule 404(b) Notice.  *See* Gov't Reply at 3.  The Government untimely made this disclosure in its Reply Brief filed on April 13—more than two weeks after the deadline for Rule 404(b) disclosures.  *See* Min. Order (Mar. 11, 2026).

### a.  Federal Rule of Evidence 404(b)

Rule 404(b) prohibits "the admission of evidence of 'other crimes, wrongs, or acts' when its use is to show propensity, *i.e.*, where the jury is encouraged to make the inference that because the defendant committed *another* bad act, he is more likely to have committed the charged act." *United States v. Mitchell*, 49 F.3d 769, 774 (D.C. Cir. 1995) (quoting Fed. R. Evid. 404(b)(1)).  "Yet the rule permits such evidence for other purposes, including proof of motive, intent, knowledge, identity and absence of mistake." *United States v. Douglas*, 482 F.3d 591, 596 (D.C. Cir. 2007).  "Indeed, 'Rule 404(b) is a rule of inclusion rather than exclusion,' 'prohibiting the admission of other crimes evidence in but one circumstance—for the purpose of proving that a person's actions conformed to his character.'"  *Id.* (first quoting *United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000); and then quoting *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (en banc)).  In other words, other crimes evidence is "admissible . . . provided it has *any* purpose other than seeking to prove a criminal propensity." *United States v. Green*, 149 F.4th 733, 751 (D.C. Cir. 2025) (emphasis in original).

The ankle monitor evidence is arguably not even other crimes subject to Rule 404(b) because evidence of what Fletcher was wearing and where he was located on the day of the charged crime is evidence that "is inextricably intertwined with the charged crime" and therefore "intrinsic." *Bowie*, 232 F.3d at 927; *see also United States v. Moore*, 651 F.3d 30, 63 (D.C. Cir. 2011) ("When evidence of such acts is intrinsic to the charged crime, it is not evidence of other acts and is thus wholly unregulated by Rule 404(b)." (cleaned up)).  Nevertheless, because the ankle monitor evidence indicates that Fletcher "previously committed some crime distinct [from] the crime charged," the court will analyze its admissibility under Rule 404(b). *United States v. Hemphill*, 642 F. App'x 448, 452 (5th Cir. Apr. 4, 2016).

The ankle monitor evidence is admissible under Rule 404(b) for the purposes the Government seeks to use it.  First, the evidence is "probative of [Fletcher's] identity." *Hemphill*, 642 F. App'x at 453 (evidence that defendant was wearing an ankle monitor at the time of the drug sales was probative of the fact that the defendant was the seller captured on video who had "a light emanating from [his] ankle").  As the Government contends, the ankle monitor "serves as a particularly distinctive item of identification" and would therefore help the jury determine whether Fletcher is the robber captured on CCTV footage wearing such a device. Gov't Mot. at 7.  Second, the GPS data placing Fletcher at the scene of the robbery is likewise probative of identity and opportunity.  *See Hemphill*, 642 F. App'x at 453 ("Hemphill's pretrial services officer testified based on GPS data from the device that Hemphill was wearing at the time of the two sales" helped prove the Government's allegation that Hemphill was selling drugs out of his home and was "probative of opportunity and identity").  Finally, Rule 404(b) also permits the Government to use the GPS data from Fletcher's ankle monitor to explain how police located Fletcher and his codefendants in the Ford Fusion mere hours after the robbery.  That is a purpose unrelated to Fletcher's character or propensity to commit crime, and "any purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character."  *Cassell*, 292 F.3d at 792 (emphasis in original) (quoting *United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990)).  In sum, the ankle monitor evidence is admissible under Rule 404(b).

### b.  Federal Rule of Evidence 403

Even if evidence is admissible under Rule 404(b), it must still be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]"  Fed. R. Evid. 403.  Evidence is not unfairly prejudicial merely because it is incriminating.  Indeed, "[v]irtually

all evidence is prejudicial, or it isn't material.  The prejudice must be unfair." *United States v. Cassell*, 292 F.3d 788, 796 (D.C. Cir. 2002) (quoting *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977)).  To be sure, other crimes evidence raises the risk of unfair prejudice because of its "tendency to divert the attention of the jury from the question of the defendant's responsibility for the crime charged to the improper issue of his bad character." *Bowie*, 142 F.3d at 1305 (cleaned up).  "But this danger cannot give rise to a *per se* rule of exclusion." *United States v. Pettiford*, 517 F.3d 584, 590 (D.C. Cir. 2008) (cleaned up).  "Rule 403 tilts . . . toward the admission of evidence in close cases, even when other crimes evidence is involved," unless the "probative value is substantially outweighed by the danger of unfair prejudice." *Douglas*, 482 F.3d at 600 (cleaned up) (emphasis added).  Moreover, a limiting instruction explaining to the jury how it may use the evidence is "ordinarily . . . sufficient to alleviate the risk" that the jury will improperly use it as bad character evidence, "absent some showing of 'compelling or unique evidence of prejudice.'" *Green*, 149 F.4th at 753 (quoting *Cassell*, 292 F.3d at 796)).

Here, the balance tips in favor of admission.  The probative value of the ankle monitor evidence is significant:  It places Fletcher at the scene of the robbery, helps identify him as one of the assailants on the CCTV footage, and explains to the jury how police found the defendants so quickly.  To be sure, "the probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point." *Henderson v. Geo. Wash. Univ.*, 449 F.3d 127, 137 (D.C. Cir. 2006) (quoting *Old Chief v. United States*, 519 U.S. 172, 185 (1997)) (cleaned up).  And here, CCTV footage depicts individuals the Government alleges to be Defendants with their faces and clothing visible.  But although the footage may show someone who looks like Fletcher, the GPS data places Fletcher specifically—because of the tracking device attached to his person—at the scene of the robbery at the time it occurred.

Moreover, the visible ankle monitor on the robber in the CCTV footage is a unique identifier that helps prove that the robber does not merely resemble Fletcher but is in fact him. Thus, the ankle monitor evidence is not redundant of the footage—it is qualitatively different evidence that helps the Government corroborate the footage and rebut potential skepticism about its reliability and what it shows. Finally, the GPS data explains what led police to the Ford Fusion, where they recovered Miller's stolen property; without that evidentiary thread, the jury would be left with an unexplained gap in the Government's story. *See Old Chief*, 519 U.S. at 189 (prosecution should generally be allowed to present "the natural sequence of narrative evidence" because "[p]eople who hear a story interrupted by gaps . . . may be puzzled at the missing chapters").

The risk of unfair prejudice is, by contrast, not as significant. To start, Fletcher is charged with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Because a prior felony conviction is an element of a charged offense and Fletcher is a young man, the jury will necessarily learn, either by stipulation or evidence, that Fletcher was a recently convicted felon at the time of the robbery. Thus, it will not shock the jury that Fletcher was on some form of criminal justice supervision, and the additional risk of unfair prejudice is marginal. *See United States v. Wilburn*, --- F.4th ---, 2026 WL 913399 (8th Cir. 2026) ("There was little risk of unfair prejudice from testimony that Wilburn was on parole because the jury elsewhere received evidence that he was convicted of a felony in 2021."); *see also United States v. Jones*, 930 F.3d 366, 374–75 (5th Cir. 2019) ("Jones's judgment of conviction was admissible to prove an element of one of his charged offenses. The additional prejudicial effect of permitting the jury to consider Jones's prior conviction to help determine his intent was therefore diminished."); *United States v. Williams*, 526 F. App'x 29, 35 (2d Cir. June 4, 2013) ("[B]ecause an element of the offense charged involved being a convicted felon, there was very little risk of

unfair prejudice to Williams in introducing evidence of his 1997 conviction because the jury already knew of his status as a felon."); *United States v. Murphy*, 172 F. App'x 461, 464 (3d Cir. 2006) (upholding the district court's determination that "any prejudicial inference, because of a prior conviction[,] is lessened by the fact that the jury already knows that [the defendant] has been convicted of a felony, because of either stipulation or evidence of a prior felony, which is one of the elements of the crime charged").

This risk, moreover, can be minimized by appropriate safeguards. *See United States v. Han*, 962 F.3d 568, 573 (D.C. Cir. 2020) (appropriate safeguards to minimize the danger of unfair prejudice include a limit on what details the Government can elicit and a precautionary limiting instruction). First, beyond establishing the fact that Fletcher was on an ankle monitor in connection with his supervision, the court will not permit the Government to present information about why that was so. The Government cannot, for example, elicit testimony that Fletcher was placed on a monitor by his CSO because of Fletcher's noncompliance with his conditions of supervision. *See United States v. Straker*, 800 F.3d 570, 591 (D.C. Cir. 2015) (upholding admission of other crimes evidence where the district court "prevented the government from soliciting testimony about particularly prejudicial details"). Second, the court will warn the Government to keep the amount of time it spends questioning witnesses about the ankle monitor evidence to a minimum. Finally, the court is willing to instruct the jury regarding how it can and cannot use the ankle monitor evidence. The court will entertain any proposed limiting instruction at the Pretrial Conference and will also consider any other defense request to sanitize the presentation of this evidence.

### VII.   MOTIONS TO SEVER

Finally, each Defendant has separately moved to sever his trial from the trial of his codefendants.   *See* Fletcher's Mot. to Sever, ECF No. 39; Bynum's Mot. to Sever, ECF No. 50; White's Mot. to Sever, ECF No. 59.  For the reasons below, the court will DENY these motions.

Federal Rule of Criminal Procedure 8(b) "permit[s] joinder of defendants 'alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.'"  *United States v. Tucker*, 12 F.4th 804, 824 (D.C. Cir. 2021) (quoting Fed. R. Crim. Pro. 8(b)).  Defendants do not dispute that they have been properly joined under Rule 8(b) and for good reason.  The Government has furnished CCTV footage purporting to show that (1) White, Bynum, and Fletcher observed Miller walking into a convenience store; (2) White and Bynum then ran off together, and Fletcher soon followed them; (3) shortly thereafter, the three men returned to the front of the store, each wearing a black ski mask, and waited until Miller walked out; (4) as Miller exited the store, White, Bynum, and Fletcher—each holding a gun—jumped him, with White and Fletcher tackling Miller to the ground; and (5) as White and Fletcher held Miller to the ground, Bynum took a Gucci bag from Miller's person.  This alleged concerted robbery plainly constitutes "the same act or transaction, or . . . the same series of acts or transactions" within the meaning of Rule 8(b).

Even so, under Federal Rule of Criminal Procedure 14(a), "the court may . . . sever" the trials of joined defendants if "the joinder of . . . defendants appears to prejudice a defendant." But "the permissive language of this rule makes clear that severance is not required even if prejudice is shown."  *Tucker*, 12 F.4th at 825 (cleaned up).  Severance is granted "sparingly because of the 'strong interests favoring joint trials, particularly the desire to conserve the time of courts, prosecutors, witnesses, and jurors.'"  *United States v. Celis*, 608 F.3d 818, 844 (D.C. Cir. 2010) (quoting *United States v. Mardian*, 546 F.2d 973, 979 (D.C. Cir. 1976)).  This preference

for joint trials is "especially strong" when codefendants are charged with "participating in the same illegal acts" and those charges involve "much the same evidence" and "testimony of the same witnesses." *United States v. Wilson*, 605 F.3d 985, 1016 (D.C. Cir. 2010) (quoting *United States v. Ford*, 870 F.2d 729, 731 (D.C. Cir. 1989)). Indeed, "severance is the exception rather than the rule and is required only when there is 'a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *Tucker*, 12 F.4th at 825 (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). "[E]ven in cases where the risk of prejudice is high, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" *Id.* (quoting *Zafiro*, 506 U.S. at 539).

Here, the preference for a joint trial is "especially strong" because White, Fletcher, and Bynum are charged with the same offenses and the Government will use "much the same evidence" and testimony to convict them, including the same CCTV footage and the testimony of the same officers who found Defendants together in the Ford Fusion hours after the robbery. *Wilson*, 605 F.3d at 1016 (quoting *Ford*, 870 F.2d at 731). And because Defendants' attempts to articulate prejudice are unavailing, they have not overcome this strong preference in favor of a joint trial.

Each Defendant expresses concern that his codefendants will try to pin the blame on him and will therefore act as a "second prosecutor." Specifically, Fletcher fears that Bynum "will attempt to portray [Fletcher] as the primary actor in this incident." Fletcher's Mot. at 4. Bynum suspects his codefendants "may argue" that Bynum's alleged conduct in shooting at the intersection caused White to shoot Miller. Bynum's Mot. at 3. And White believes both

Fletcher and Bynum will pin the blame for Miller's death on him since he allegedly shot Miller. White Mot. at 3.

But on this record, such "plain and simple blame-shifting" does not support a severance to avoid mutually antagonistic arguments. *United States v. Rivera*, 6 F.3d 431, 438 (7th Cir. 1993); *see also United States v. Fields*, 763 F.3d 443, 457 (6th Cir. 2014) ("The mere fact that each defendant 'points the finger' at his co-defendant is insufficient" to require severance.). To start, the Supreme Court has made clear that "mutually antagonistic defenses are not prejudicial *per se*." *Zafiro*, 506 U.S. at 538. To the contrary, severance is appropriate "*only* if there is a serious risk" to a defendant's specific trial right or "a serious risk that" joint trial would "prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539 (emphasis added). And simple blame-shifting neither compromises a specific trial right nor "necessarily prevent[s] a jury from making a reliable judgment." *Rivera*, 6 F.3d at 438; *see also United States v. Weckham*, 982 F.3d 1167, 1173 (8th Cir. 2020) ("Co-defendants do not suffer prejudice simply because one co-defendant's defense directly inculpates another[.]").

As the D.C. Circuit has explained, the concern about mutually antagonistic arguments is that "the jury will *unjustifiably* infer that this conflict *alone* demonstrates that both defendants are guilty or, alternatively, that the jury will decide that at least one of the defendants is guilty regardless of whether the government has met its burden of proof." *United States v. Gilliam*, 167 F.3d 628, 635 (D.C. Cir. 1999) (emphasis added); *see also Weckham*, 982 F.3d at 1173 ("Antagonistic defenses require severance only when there is a danger that the jury will unjustifiably infer that *this conflict alone demonstrates that both are guilty*." (emphasis in original)); *Fields*, 763 F.3d at 457 (To prevail on a mutually antagonistic defenses claim, Defendants must "show that an antagonistic defense would present a conflict so prejudicial that

. . . the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty."). But where the Government "offer[s] sufficient evidence that both defendants are guilty independent of the parties' antagonism," there is no reason to think the jury will unreliably infer guilt from finger-pointing among the codefendants. *Weckham*, 982 F.3d at 1173; *see also Gilliam*, 167 F.3d at 635 (indicating that there is no prejudice, even if the codefendants' "defenses were mutually antagonistic," where "[e]ach defendant's culpability was separately demonstrated"); *United States v. Bikundi*, No. 14-cr-30, 2016 WL 912169, at *46 (D.D.C. Mar. 7, 2016) (severance not warranted "even when one defendant assumes the role of second prosecutor and accuses another of committing the charged crime," "'when there is substantial and independent evidence of each defendant's significant involvement in the conspiracy'" (quoting *United States v. Moore*, 651 F.3d 30, 96 (D.C. Cir. 2011)). Here, because there is substantial evidence that all Defendants are guilty independent of their potentially antagonistic arguments at trial, that antagonism will not seriously prejudice them.

Next, Bynum contends that severance is warranted because there is more evidence against his codefendants than there is against him. Bynum's Mot. at 3. But "absent a *dramatic* disparity of evidence, any joinder is best dealt with by instructions to the jury to give individual consideration to each defendant"—instructions which this court intends to give and expects the parties to be prepared to discuss at the Pretrial Conference. *See Moore*, 651 F.3d at 95 (emphasis in original). And here, any disparity in evidence is not dramatic at all. Although it is true that only White allegedly shot Miller, that is largely irrelevant to whether Bynum participated in the armed robbery and is therefore liable for Miller's death under a felony murder theory. Finally, although Bynum was not wearing a GPS monitor like Fletcher, Bynum's alleged participation was nevertheless captured on CCTV footage, and he was found in the Ford Fusion alongside his

codefendants and Miller's stolen Rolex mere hours after the robbery. Thus, it cannot be said that the evidence against his codefendants "is far more damaging than the evidence" against Bynum. *Id.* (cleaned up). For the foregoing reasons, the motions to sever will be DENIED.

## VIII.   CONCLUSION

In sum, the court will DENY Defendants' motions to suppress, to suppress, and to sever. The court will GRANT the Government's motion to introduce 404(b) evidence, except evidence that police stopped the gray Ford Fusion and observed Fletcher exit the driver's seat of the vehicle in May 2021. A separate Order will follow this Opinion.

Date: April 27, 2026

*Tanya S. Chutkan*

TANYA S. CHUTKAN
United States District Judge